**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

IN RE:                                    :
                                          :        **Chapter 7**
**PARTNERS GROUP FINANCIAL, LLC,**        :
                                          :        **Bky. No. 05-39390ELF**
                    Debtor(s).            :
                                          :

# M E M O R A N D U M   O P I N I O N

## I. INTRODUCTION

In this chapter 7 bankruptcy case, Daniel and Rita Shoemaker (collectively, "the Claimants") filed a proof of claim asserting an unsecured claim for $179,290.50 ("the Claim"). Partners Group Financial, LLC ("the Debtor") has filed an objection ("the Objection") to the Claim.

The Claim arises from the Debtor's admitted failure to meet its contractual obligation to find a mortgage lender for the Claimants in connection with the Claimants' purchase of residential real estate. The Claimants assert that the Debtor is liable for breach of contract and for violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§201-1 et seq. ("the CPL").

The Debtor does not contest its liability on the breach of contract facet of the Claim. Nor does it contest a portion of the damages claimed for breach of contract. The Debtor does dispute: (1) the asserted consequential damages for lost profits and lost income arising from the contractual breach and (2) the Claimants' asserted entitlement to treble damages, attorneys' fees and costs under the CPL.

For the reasons set forth below, I will sustain the Objection in part and overrule it in part.

1

I will not allow the requested damages for lost profits and lost income; I will allow only the uncontested actual damages.  However, I will also allow the uncontested, actual damages to be trebled under the CPL.  Finally, I will allow counsel fees and costs in the requested amount.  The result is that the Claim will be allowed in the amount of $42,699.43.

## II.  PROCEDURAL HISTORY

The Claimants filed their Claim on September 22, 2006.   The Claim is supported by the verified allegations of the Claimants' prepetition complaint ("the Complaint") filed against the Debtor and the Debtor's agent, Reita Detweiler ("Ms. Detweiler"), a copy of which is attached to the Claim as Exhibit "B."[1]

The allegations of the Complaint may be summarized as follows:

1. On July 23, 2002, the Claimants entered into a contract to purchase real estate at 2524 Old House Point Road, Fishing Creek, Maryland 21634 ("the Property"), for $450,000.00.  That contract was contingent upon the Claimants obtaining a thirty (30) year mortgage for $400,000.00.  See Complaint ¶6.

2. On or about July 23, 2002, the Claimants retained the Debtor and/or Ms. Detweiler to attempt to find a lender for the Claimants who would finance 90% of the purchase price of the Property.  See Complaint ¶¶ 8, 30 (alleging that the Debtor promised to provide the Claimants with a willing lender in the amount of $405,000.00 at an interest rate of 8.0% and would receive 1.0% of the amount financed in fees).

3. On July 26, 2002, the Debtor's agent, Ms. Detweiler, sent a fax to a realtor involved in the real estate acquisition telling the realtor that the Debtor had sought approval from lending institutions and expected to have a pre-approval in hand by the end of the day.  See Complaint ¶ 9.

4. On July 30, 2002, Ms. Detweiler ordered an appraisal of the Property.  See Complaint ¶ 11.

---

[1]    The state court action was titled and docketed as Shoemaker v. Partners Group Financial et al., No. 04-21490 (C.P. Mtgy.).

2

5.    On August 2, 2002, the Debtor sent the Claimants a mortgage loan commitment for a loan in the amount of $405,000.00 with 8.0% interest.  See Complaint ¶12.

6.    On August 5, 2002, Ms. Detweiler requested that the Claimants provide her with copies of their W-2s for 2000 and 2001 so that she could assist them in obtaining the best possible interest rate on a mortgage.  See Complaint ¶13.

7.    On August 9, 2002, settlement on the Property was scheduled for August 19 at 3:00 p.m.  See Complaint ¶14.

8.    On August 15, 2002, Ms. Detweiler faxed good faith estimates of fees based on proposed mortgages with interest rates of 6.5%, 7.25% and 7.99% to the Claimants.  See Complaint ¶15.

9.    The Debtor and its agents or employees failed to attend the August 19, 2002 settlement despite their knowledge of its time and place.  See Complaint ¶ 16.

10.   The Debtor made no effort to obtain a mortgage for the Claimants after the August 19, 2002 settlement date and, in fact, ceased all communications with the Claimants.  See Complaint ¶¶ 17-18.  The Debtor failed to provide the Claimants with any willing mortgage lender, regardless of the interest rate or amount, either before or after the scheduled date for settlement.  See Complaint ¶32.

11.   The Claimants relied to their detriment on the Debtor's commitment to provide them with a willing mortgage lender and the Claimants' reliance on the Debtor's assertions was justifiable and reasonable.  See Complaint ¶¶ 35-36.

12.   Mr. Shoemaker had no choice but to find and secure a lender on his own, which he eventually did, but on less favorable terms than the ones promised by the Debtor.  See Complaint ¶¶ 22, 23, 33, 37, 43, 53, 58.

13.   The Debtor's unexpected breach of its obligation to obtain financing for the Claimants disrupted the effective operations of Mr. Shoemaker's business, Atlantic Circulation, Inc., his sole means of income.  See Complaint ¶ 20.

14.   On September 3, 2002, the Claimants finally closed on the transaction for the purchase of the Property and obtained possession of the Property.  See Complaint ¶ 21.

The Complaint pleaded causes of action for, inter alia, breach of contract and violation of

the CPL.  With respect to the CPL claim, the Complaint alleged that the Debtor's actions, as

3

described above, were deceptive and/or created a likelihood of confusion and/or otherwise

violated the CPL and that the Claimants relied, to their detriment, on the Debtor's commitment to

provide them with a willing mortgage lender.  See Complaint ¶¶ 35-36, 56.

The Complaint asserted that, as a result of the Debtor's failure to meet its mortgage

commitment, the Claimants and their children were forced to stay in a hotel and rent a house

until settlement could occur on September 3, 2002, that Mr. Shoemaker's business was disrupted

by his having to scramble to obtain alternate financing and that the Claimants suffered damages

as a consequence of the Debtor's wrongful actions.  See Complaint ¶¶ 19-25.

In the Claim, the Claimants asserted the following damages:

| | |
|---|---:|
| Increased settlement and interest costs | $  7,595.00 |
| Food, lodging and additional moving and storage fees | 3,612.50 |
| Consequential damages in the form of lost profits and lost income | 48,556.00 |
| **Subtotal** | **$ 59,763.50** |
| Treble damages under Pennsylvania's Unfair Trade Practices Act | x        3 |
| **Claim Total** | **$179,290.50** |

See Proof of Claim No. 5 (Exhibit B thereto, at ¶¶ 37, 43, 53, 58-59).  By virtue of their

incorporation of the Complaint, they also sought attorneys' fees and costs.  See Proof of Claim

No. 5 (Exhibit B, ad damnum clauses).

The Debtor filed its Objection to the Claim on December 13, 2007.  A hearing on the

Objection was held and concluded on April 7, 2008.[2]

_____

[2]        Following the filing of the Debtor's Objection, the Claimants filed both a
Response to the Debtor's Objection ("Response") and a Motion to Strike, Dismiss, Stay or Continue the

During the April 7th hearing, the Claimants reduced their demand for lost profits and income to $41,361.25. See, e.g., Claimants' Post-Trial Brief at 4. They also produced evidence of $9,076.93 in legal fees and costs (i.e., $8,206.00 in fees and $870.93 in costs) that they incurred in connection with the prepetition state court action. See Exhibit S-9 (legal fees/costs); Proof of Claim No. 5 (Exhibit B).

Daniel Shoemaker ("Mr. Shoemaker") was the only witness at the April 7th hearing. Each party introduced a number of exhibits into evidence.[3]

_____

Debtor's Objection ("the Motion"). See Docket Entry Nos. 33, 34. In their Motion and under the category of New Matter and Affirmative Defenses in their Response, the Claimants contended that the Debtor lacked standing to assert the Objection and that, therefore, the Objection should be dismissed or stricken. Alternatively, the Claimants contended that, should the court find that the Debtor had standing to assert the Objection, the hearing on the Debtor's Objection should be postponed until such time as it could be determined with certainty that Debtor's bankruptcy estate would contain assets. Debtor filed a Response to the Motion on December 31, 2007. See docket entry no. 38.

Before the April 7 hearing began, I heard argument on the Claimant's Motion discussed in n.2, supra, and concluded that the Motion should be denied.

First, with respect to the Claimants' contention that the Debtor lacked standing to assert the Objection, generally, in a chapter 7 case, only the chapter 7 trustee has standing to object to proofs of claim. E.g., In re Toms, 229 B.R. 646, 650 (Bankr. E.D. Pa. 1999). A debtor has standing to object if the bankruptcy estate is solvent, or there is a reasonable possibility that the estate will be solvent. If the estate is solvent, a reduction of a claim benefits the debtor by increasing the refund to the debtor after the estate has paid all allowed claims. See 11 U.S.C. §726(a)(6). In such circumstances, the debtor has a sufficient pecuniary interest in the outcome of a claims objection to give the debtor standing to object to the claim. See, e.g., Toms, 220 B.R. at 650-51.

During argument on the Motion, I took judicial notice of: (a) the claims register and the total amount of allowed claims in this bankruptcy case and (b) the amount at issue in a number of pending adversary proceedings in which the chapter 7 trustee seeks to set aside prepetition monetary transfers on behalf of the bankruptcy estate. Based on this information, I concluded that there was a reasonable possibility that the bankruptcy estate would be solvent and that the Debtor had standing to prosecute the Objection. In light of this conclusion, I saw no reason to postpone determination of the merits of the Objection and the case proceeded to trial that day.

[3]     Although the Complaint that was attached to the Claim sets forth several additional counts, at the hearing, the Claimants pressed only their claim for breach of contract (with the only dispute between the parties being whether the Claimant was entitled to damage for lost profits) and their

On May 7, 2008, the parties filed simultaneous post-trial memoranda in support of their respective positions.  This matter is now ready for disposition.

### III.    FACTUAL BACKGROUND

Based on the evidence, I make the following findings of fact.

On July 23, 2002, the Claimants entered into an agreement of sale to purchase residential real estate in Maryland (previously defined as "the Property") for $450,000.00 with settlement to take place on or before August 23, 2002.  See Exhibit D-1.[4]  Soon thereafter, Mr. Shoemaker contacted Ms. Detweiler, an employee of the Debtor, and entered into a contractual relationship with the Debtor pursuant to which the Debtor would find the Claimants a lender who would finance 100% of the purchase price of the Property.[5]

Mr. Shoemaker was in close communication with Ms. Detweiler during this initial time period.   During this time, Ms. Detweiler assisted him in addressing blemishes on his credit report.  Additionally, Mr. Shoemaker shared with Ms. Detweiler "how scary" he found the notion of uprooting his family from Mountville, Pennsylvania (where the family had resided for the past 12 years) to Fishing Creek, Maryland, as well as his concerns regarding the effect such a move

---

CPL claim.  Accordingly, I shall treat any remaining claims as abandoned.

[4]    At this time, the Claimants were living at 398 Jay Lane, Mountville, Pennsylvania.

[5]    Mr. Shoemaker had a colleague who had experience finding mortgage financing through the Debtor.  This colleague referred Ms. Detweiler and/or the Debtor to the Claimants.  Both parties treat their relationship as contractual, however, I note that neither party produced a copy of the brokerage agreement that typically attends such arrangements.  Nonetheless, I accept the Debtor's and the Claimants contractual relationship as an undisputed fact.

might have on his ability effectively to run his business, which had an office in Mountville.  Mr. Shoemaker was particularly concerned about being able to run his business in a "state of flux."

Mr. Shoemaker was and is the owner and operator of Atlantic Circulation, Inc. ("Atlantic" or "the business"), a company that processes magazine subscription orders obtained through door-to-door solicitation.  In 2002, Mr. Shoemaker managed a group of no more than 10 salespeople who sold magazine subscriptions in residential communities throughout the United States.[6]  He also supervised approximately 20 other companies, each with their own sales forces, with whom his business contracted.[7]  Atlantic maintained a business office in Mountville, Pennsylvania, however, Mr. Shoemaker conducted the majority his business from outside that office, via telephone.

At Ms. Detweiler's suggestion, Mr. Shoemaker took a number of actions designed to alleviate his concerns regarding the effect the move might have on his ability to operate his business effectively and to ensure a seamless transition of Atlantic's business operations following his family's move to Maryland.[8]  Also relevant to this dispute, Mr. Shoemaker scheduled an appointment to have telephone lines installed at the Property on the day of the scheduled closing, and to have satellite internet service installed the day after the closing. Having available land line service was important to Mr. Shoemaker in the operation of his business because he believed cell phone service on Maryland's Eastern Shore to be sporadic and

---

[6]    It appears that this particular sales group was known as Atlantic Periodical.

[7]    Mr. Shoemaker did not explain the relationship between the other companies and Atlantic in further detail.

[8]    Although Mr. Shoemaker's family moved to Maryland, he testified that Atlantic continued to maintain the Mountville office for several years after the move.

unreliable.  He used the internet to obtain business reports.

At some point in July 2002, Ms. Detweiler informed the Claimants that she could

obtaining financing for only $405,000.00 or 90% of the purchase price of the Property.  She

suggested that the Claimants finance the remaining portion of the purchase price by convincing

the sellers of the Property to take back a second mortgage.  She also counseled the Claimants

concerning how they might approach the sellers with this request.  The Claimants followed Ms.

Detweiler's advice and obtained a second mortgage commitment from the sellers.

Subsequently, on August 2, 2002, the Debtor sent the Claimants a document titled

"Mortgage Loan Commitment" (previously identified as "the Loan Commitment").  The Loan

Commitment states: "It is a pleasure to notify you that your application for a mortgage loan has

been approved subject to the matters set forth below."[9]  The Loan Commitment states that the

loan terms include a principal amount of $405,000.00 and a fixed interest rate of 8.0%, with the

commitment expiring on August 31, 2002.  See Exhibit D-2; Claimants' Post-Trial Brief at 2.

Mr. Shoemaker understood the Loan Commitment to represent that the Debtor had secured a

willing lender for the Claimants.

Closing on the Claimants' acquisition of the Property was scheduled for August 19, 2002.

Mr. Shoemaker worked closely with Ms. Detweiler in setting this date.

Mr. Shoemaker testified that he was in constant communication with Ms. Detweiler in the

days leading up to August 19th.  The day before the scheduled closing date (i.e., August 18th), Mr.

Shoemaker spoke with Ms. Detweiler and received her assurances that everything was going to

---

[9]        The "matters" (i.e, the conditions) referred to in the Loan Commitment appear to be that
evidence of title showing no liens, encumbrances or adverse covenants or conditions be provided from a
source and in a form acceptable to the lender.  See Exhibit D-2.

go smoothly, that everything was taken care of and that a Debtor's representative would "see

[him] tomorrow."

Relying on the Debtor's representation and Ms. Detweiler's assurances, on August 19th,

the Claimants vacated their residence in Pennsylvania, placed their food in a cooler and

transported their possessions by moving van to Maryland, accompanied by their three (3)

children, a cat and a dog.  They planned to move into the Property immediately following the

closing.  The Claimants waited until 6 p.m. for a Debtor's representative to show up with the

required financing.  No one came.  Additionally, the Claimants were unsuccessful in their efforts

to reach anyone at the Debtor's offices by phone because no one was answering the Debtor's

phones that day.  Neither the Debtor nor Ms. Detweiler ever contacted the Claimants subsequent

to August 18th.

The closing was not completed on August 19th.  The Claimants and their family were

forced to find temporary housing, staying first in a hotel and eventually renting a house until

September 3rd, the date upon which settlement on the Property finally occurred.  Mr. Shoemaker

testified that he and his family were thrown into a state of total "chaos."

As a result of the Debtor's conduct, Mr. Shoemaker was forced to spend the next two

weeks working to salvage the Claimants' acquisition of the Property by attempting to find

replacement financing.[10]  Moreover, with no land line phone available in his rental home and

with poor or no cell phone reception available in the area in which the Claimants were staying,

Mr. Shoemaker needed to drive to Cambridge, Maryland and make cell phone calls from his car

---

[10]     Mr. Shoemaker complained that his attention to these tasks was paid at the expense of
time he would have devoted to Atlantic and getting his children enrolled in a new school.

9

to accomplish this task.  With what he described as "considerable difficulty and effort," he finally

obtained financing one (1) day before the rescheduled closing date, albeit on less favorable terms.

During the fifteen (15) day delay before they could close on the Property, the Claimants

incurred expenses for temporary housing, food and moving/storage expenses for their

belongings.  The Claimants obtained replacement financing in the form of a mortgage loan from

Wall Street Mortgage Corporation with a variable interest rate of 8.0%, two (2) points and a

prepayment penalty.

The Claimants incurred damages in the amount of $7,595.00 as a result of the less

favorable terms of the new mortgage.  Additionally, the delay in settlement caused the Claimants

to incur out-of-pocket expenses for food, lodging and storage in the amount of $3,612.50.  The

parties agree that these damages total $11,207.50.  The Debtor has no objection to the allowance

of an unsecured claim in that amount.

Furthermore, because the Claimants could not close on and take possession of the

Property on August 19th as planned, the phone lines and internet service could not be installed as

scheduled.  Instead, these services were installed in the latter half of September 2002,

approximately two (2) weeks after the Claimants finally closed on the Property.  Mr.

Shoemaker's ability to maintain telephone contact with his office was impeded, at least to some

degree, between August 19th and the date upon which the telephone lines were installed.

Additionally, his lack of internet service hampered his ability to obtain Atlantic's business

reports.[11]

---

[11]      At one point in his testimony, Mr. Shoemaker testified that his business was virtually
"stopped in its tracks" during the relevant time period.  This colloquial reference was offset by his
testimony that he was not completely out of communication with Atlantic during the relevant time period
and that he was not completely precluded from doing business.  His testimony was that he was not in

The Debtor offered no evidence to explain why it failed to provide the Claimants with a

lender willing to provide the financing described in the Loan Commitment.  When Mr.

Shoemaker was asked why he thought Ms. Detweiler reassured him on August 18th, rather than

advising him before his family left for Maryland, that the Debtor would not have funding

available in time for the August 19th closing, he said that Ms. Detweiler had told him that she

stood to make a large commission.  He theorized from this that on August 18th Ms. Detweiler was

still engaged in last minute efforts to find a willing lender and did not wish to reveal this

information to the Claimants for fear of losing her commission.


## IV.  DISCUSSION

In support of their claim for lost profits/income, the Claimants assert that Mr.

Shoemaker's business operations were disrupted as a result of:  (1) the delay in closing and

attendant delay in having available land line phone and satellite internet service, (2) the time he

had to devote to obtaining replacement financing, arranging for a new closing date, rescheduling

vendors for installation of phone and internet services and related tasks, and (3) the difficulties he

experienced in communicating with his office and obtaining business reports.  Mr. Shoemaker

maintains that his ability to conduct his business was impaired for 30 days.[12]  He claims that this

---

communication with his office as he believed he should have been but that he did the best he could to
keep the business surviving.


[12]    This period of approximately thirty (30) days is comprised of the 15-day delay in closing
on the Property, during which time the Shoemakers lived in temporary housing, and the two-week delay
post-closing (i.e., the re-scheduled closing date of September 3, 2002), during which time internet and
telephone services had not yet been installed at the Property.

disruption reduced his business' income and profits and that the Claimants are entitled to consequential damages for those lost profits.[13]

Further, in support of the CPL claim, the Claimants assert that the Debtor engaged in "unfair and deceptive" conduct within the meaning of 73 P.S. §201-2(4)(xxi), which defines the terms "unfair methods of competition" and "unfair or deceptive acts or practices" as including "any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."[14]  Specifically, the Claimants assert that the Loan Commitment constituted a false or misleading representation made by the Debtor that it had obtained a mortgage loan for the Claimants, when in fact it had not.  The Claimants also contend that the assurances that Ms. Detweiler made to Mr. Shoemaker the day before the Claimants left for Maryland constituted false and/or misleading representations.  The Claimants request that they be allowed treble

---

[13]    The Claimants have not addressed why the lost profits of Atlantic, an entity that did not file a proof of claim, are allowable.  Presumably, they view Atlantic's lost profits as translating directly into lost income for Mr. Shoemaker.  Perhaps for this reason, the Claimants have not distinguished between "lost income" and "lost profits," implicitly treating the latter as a function of the former.  Because the Debtor has not challenged this approach, I will accept it.  For ease of reference, in the remainder of this Memorandum, I will refer to the Claimants' asserted entitlement for "lost profits and lost income" as a claim for "lost profits."

Also, the Claimants have not differentiated between Mr. and Mrs. Shoemaker in pressing the claim for lost profits, even though there is nothing in the record to suggest that Mrs. Shoemaker has any entitlement to such damages.  It appears that, as a married couple, the Claimants are treating themselves as a single entity for purposes of this Claim.  Because the Debtor has not objected this treatment, I will refer to claim for lost profits as that of the Claimants, not just Mr. Shoemaker.

[14]    This provision is commonly referred to as the "catch-all" provision of the CPL.

damages, legal fees and costs pursuant to 73 P.S. §201-9.2.[15]

The Debtor disputes the asserted entitlement to damages for lost profits and the

Claimants' asserted entitlement to treble damages and attorney's fees and costs under the CPL.

For the reasons set forth below, I agree with the Debtor with respect to its Objection to

the claim for lost profits, and with the Claimants with respect to their CPL claim.


### A. Burden of Proof

In proof of claim litigation in bankruptcy court, there are burden shifting mechanisms that

come into play.  These mechanisms are derived from the interaction of the Bankruptcy Code and

the Federal Rules of Bankruptcy Procedure.

11 U.S.C. §502(a) provides that a proof of claim is deemed allowed unless a party interest

objects.  11 U.S.C. §502(b) provides that if an objection is filed, the claim will be allowed except

to the extent that one of the nine (9) subparagraphs in §502(b) applies.[16]  Federal Rule of

---

[15]     Section 201-9.2(a) creates a private right of action for violations of §201-3:

> (a) Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act, may bring a private action to recover actual damages or one hundred dollars ($100), whichever is greater. The court may, in its discretion, award up to three times the actual damages sustained, but not less than one hundred dollars ($100), and may provide such additional relief as it deems necessary or proper. The court may award to the plaintiff, in addition to other relief provided in this section, costs and reasonable attorney fees.

[16]     In this case, the Objection is based on 11 U.S.C. §502(b)(1), which provides for the disallowance of a proof of claim to the extent that "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured."  In effect, the Debtor is arguing that portions of the Claim should be disallowed because it lacks merit under applicable non-bankruptcy law, the law of Pennsylvania.

Bankruptcy Procedure 3001(f) provides that "[a] proof of claim executed and filed in accordance

with these rules shall constitute prima facie evidence of the validity and amount of the claim."

Our Court of Appeals has concisely summarized the shifting burdens in claims litigation

in the following frequently-quoted passage:

> [A] claim that alleges facts sufficient to support a legal liability to the claimant
> satisfies the claimant's initial obligation to go forward. The burden of going forward
> then shifts to the objector to produce evidence sufficient to negate the prima facie
> validity of the filed claim. It is often said that the objector must produce evidence
> equal in force to the prima facie case. In practice, the objector must produce evidence
> which, if believed, would refute at least one of the allegations that is essential to the
> claim's legal sufficiency. If the objector produces sufficient evidence to negate one or
> more of the sworn facts in the proof of claim, the burden reverts to the claimant to
> prove the validity of the claim by a preponderance of the evidence.

In re Allegheny Int'l, Inc., 954 F.2d 167, 173-74 (3d Cir. 1992) (citations omitted); see also In re

Gimelson, 2004 WL 2713059, at *13 (E.D. Pa. 2004); In re Galloway, 220 B.R. 236, 244 (Bankr.

E.D. Pa. 1998).

Notably, in the above-quoted passage, the Third Circuit cited the Ninth Circuit's

discussion in In re Holm, 931 F.2d 620, 623 (9th Cir. 1991) which describes the burdens of proof

this way:

> Inasmuch as Rule 3001(f) and section 502(a) provide that a claim or interest as to
> which proof is filed is "deemed allowed," the burden of initially going forward with
> the evidence as to the validity and the amount of the claim is that of the objector to
> the claim.  In short, the allegations of the proof of claim are taken as true.  If those
> allegations set forth all the necessary facts to establish a claim and are not self-
> contradictory, they prima facie establish the claim.  Should objection be taken, the
> objector is then called upon to produce evidence and show facts tending to defeat the
> claim by probative force equal to that of the allegations of the proofs of claims
> themselves.  But the ultimate burden of persuasion is always on the claimant.  Thus, it
> may be said that the proof of claim is some evidence as to its validity and amount.  It
> is strong enough to carry over a mere formal objection without more.

14

Id. (citations and internal emphasis omitted).


## B.  Consequential Damages for Lost Profits

### 1.

Both sides have made the following assumptions in presenting their arguments regarding the issue of lost profits:  (1) Pennsylvania law governs this dispute; (2) the Debtor breached its contractual promise to find a willing lender for the Claimants; and (3) lost profits, if proven, are recoverable in a breach of contract action as a form of consequential damages.[17]  I will accept the parties' assumptions for the purposes of analyzing the merits of their dispute.

Pennsylvania law "distinguishes between general damages - those ordinary damages that flow directly from the breach; and special or consequential damages - those collateral losses, such as expenses incurred or gains prevented which result from the breach." LBL Skysystems (USA), Inc. v. APG-America, Inc., 319 F. Supp. 2d 515, 523 (E.D. Pa. 2004) (quoting McDermott v. Party City Corp., 11 F. Supp. 2d 612, 624 (E.D. Pa. 1998)); see also Co. Image Knitware, Ltd., 909 A.2d at 336.  Lost profits are a form of consequential damages.  To recover damages for lost profits in a breach of contract action in Pennsylvania, a plaintiff bears the burden of establishing that such damages:

> 1.  are calculable with reasonable certainty;
>
> 2.  were proximately caused by the breach of contract; and

---

[17]    This assumption appears to be in accord with Pennsylvania law.   See Co. Image Knitware, Ltd. v. Mothers Work, Inc., 909 A.2d 324, 336 (Pa. Super. Ct. 2006) ("[g]enerally, lost profits are recoverable in breach of contract actions"); see also In re Eastern Continuous Forms, Inc., 302 B.R. 320, 341 (Bankr. E.D. Pa. 2003) ("Pennsylvania law allows consequential damages in the form of lost profits to be recovered") (quoting AM/PM Franchise Ass'n v. Atlantic Richfield Co., 584 A.2d 915, 920 (Pa. 1990)).

3.   were reasonably foreseeable.

E.g., Co. Image Knitware, Ltd., 909 A.2d at 336.

## 2.

Under Pennsylvania law, a plaintiff has the burden of proof on all three elements of a

claim for consequential damages for lost profits.  See, e.g., Brisbin v. Superior Valve Co., 2005

WL 2545302, at *1 (W.D. Pa. Oct. 11, 2005); see also James Corp. v. N. Allegheny Sch. Dist.,

938 A.2d 474, 495 (Pa. Commw. Ct. 2007) (citing Vrabel v. Commonwealth, 844 A.2d 595, 601

(Pa. Commw. Ct. 2004), appeal denied, 867 A.2d 525 (Pa. 2005) (Table)); LBL SkySystems, 319

F. Supp. 2d at 522. That burden of proof carries over into proof of claim litigation such as this.

See generally Raleigh v. Illinois Dep't of Revenue, 530 U.S. 15, 20-21, 120 S. Ct. 1951, 1955

(2000) (burden of proof on a claim derived from nonbankruptcy law is a substantive aspect of the

claim).

The Claimants did not meet their burden of proof solely through the filing of their proof

of claim.  The Claim is not entitled to prima facie status under Rule 3001(f) because it did not

satisfy the requirements of Fed. R. Bankr. P. 3001(c), which provides that if a claim "is based on

a writing," the original or duplicate of the writing shall be filed with the proof of claim.

Although the Claimants' theory appears based on the proposition that the Loan

Commitment constituted a written contract with the Debtor,[18]  I find it more likely that there was

another writing (not attached to the proof of claim) that defined the terms of consumer-broker

_____

[18]      The Claimants have treated the Loan Commitment simultaneously as a contract between
the parties (for purposes of their contract claim) and as a misrepresentation (for purposes of the CPL
claim). In its post-hearing submission, the Debtor chose to treat the Loan Commitment as nothing more
than the governing contract between the parties and not as a representation that financing had been
secured for the Claimants in the terms described therein.

relationship between the Claimants and the Debtor.  I make this finding because: (1) the proof of claim itself made reference to the Debtor's compensation being 1% of the loan -- a figure that does not appear in the Loan Commitment; (2) the Debtor's representative, Ms. Detweiler, started working on the Debtor's behalf before August 2nd; and (3) the existence of statutory requirements in Pennsylvania that loan broker agreements be in writing, see 73 P.S. §2184-86 et seq.[19]

Of course, the fact that a proof of claim is not prima facie valid on its face does not necessarily mean that it must be disallowed.  See generally In re Kirkland, 379 B.R. 341, 344 (B.A.P. 10th Cir. 2007) (after collecting cases, adopting the "exclusive view" that a claim may only be disallowed for the reasons set forth in 11 U.S.C. §502(b) and not for failure to comply with Rule 3001) (2-1 decision).  It means only that "the burden of going forward and proving its claim by the preponderance of the evidence remains on the claimant."  E.g., Kincaid, 388 B.R. at 614;  see also In re Campbell, 336 B.R. 430, 432 (B.A.P. 9th Cir. 2005).

At the hearing, both parties agreed there was a contract, a breach of contract and certain, actual damages.  With respect to the Claimants' contract claim, they differed only on the issue of lost profits.  Both sides submitted relevant evidence on that issue, arguably rendering the potential prima facie effect of Rule 3001(f) a non-issue.  See In re Lewis, 80 B.R. 39, 41 (Bankr. E.D. Pa. 1987).  Therefore, I need only determine whether, after weighing the evidence, the Claimants have satisfied their burden of proving the claimed lost profits.

As explained below, I find the Claimants have failed to meet that burden with respect to

---

[19]    I make this finding notwithstanding Mr. Shoemaker's contrary testimony.  It is possible, of course, that the Debtor did not comply with its statutory obligations and that there was no written agreement prepared prior to the Loan Commitment.  However, I find this less likely than the alternative.  Therefore, on this point, I find Mr. Shoemaker's memory to be faulty.

the second of the three (3) elements necessary for the award of damages for lost profits -- i.e. that Atlantic's reduction in profits in the period following was proximately caused by the Debtor's breach of the parties' contract.[20]

**3.**

To prove their claim for lost profits, the Claimants compared Atlantic's net income in the ten (10) month period immediately preceding August 19, 2002 with the net income in the ten (10) month period after August 19th.  Based on this data, they calculate their lost profits to be $41,361.25.  After evaluating the evidence, I conclude that the Claimants have failed to prove that the Debtor's breach was the proximate cause of the lost profits Atlantic allegedly suffered.[21]

I find the causation evidence unconvincing for the following reasons.

First, the Claimants made no showing linking Mr. Shoemaker's reduced participation in company affairs during the thirty (30) day period discussed above to the business' diminished revenue.  Instead, the Claimants appear to have employed the fallacious logical reasoning known as post hoc, ergo propter hoc: because Event #2 (a reduction in revenue) occurred after Event #1 (Mr. Shoemaker's period of reduced participation in managing his business), Event #1 must have caused Event #2.   However, because so many factors can influence a business' financial performance, something more is required to prove proximate cause.

---

[20]    This conclusion makes it unnecessary for me to consider the other two elements of the claim for lost profits.

[21]    Therefore, I find it unnecessary to determine whether the Claimants's methodology for calculating lost profits was valid or whether the lost profits were reasonably foreseeable.  See generally In re Ginko Assoc., L.P., 2008 WL 3200713, at *15-17 (Bankr. E.D. Pa. Aug. 5, 2008) (discussion of quantum and quality of proof necessary to establish claim for lost profits under Pennsylvania law).

Here, the Claimants' proof with respect to the element of causation consisted of nothing more than the chronological sequence of two facts -- i.e., (1) Mr. Shoemaker's ability to communicate with his business being impaired to some degree and (2) Atlantic's business revenue decreasing.  The Claimants did not describe the nature of Mr. Shoemaker's managerial role in the business in such a way as to demonstrate why his reduced presence for a finite period -- lasting only moderately longer than a common, personal vacation -- translated into lost profits. I find this absence of evidence particularly troublesome given the inference I draw from the record that a significant part of Atlantic's profits may be derived from the services of independent contractors who sell door to door and who do so presumably without regard to whether Mr. Shoemaker is in communication with his office.

It is possible that, during the time period in question, Mr. Shoemaker was unable to address a concern or need of one of Atlantic's contractors or to help a contractor address a customer objection and that inability translated into lost profits or that Mr. Shoemaker plays some role in developing leads for new contracts (e.g., magazines not yet included in Atlantic's catalog of offerings) and that this role was impeded, resulting in a lost business opportunity.  The record is completely devoid of such evidence, however.  There is no evidence suggesting that Mr. Shoemaker was unable to make or receive any specific phone call(s) during the thirty (30) day period that caused him to lose new or existing customers or business opportunities.  Nor is there evidence that any particular issue affecting profitability arose and that Mr. Shoemaker was left unable to address it adequately.  Absent evidence of the nature described above, I am not prepared to attribute any fall-off in business performance that may have occurred in the ten (10) month period after August 19, 2002 to the understandable distractions Mr. Shoemaker experienced in the approximately 30-day period following August 19th.

19

Second, as the Debtor has argued, there are other plausible explanations for Atlantic's alleged decreased financial performance.   An examination of Atlantic's corporate tax returns shows that returns and allowances (a figure that Mr. Shoemaker described as generally reflecting subscription cancellations) increased from $282,147.00 in 2001 to $544,236.00 in 2002, suggesting a possible reason,[22] other than Mr. Shoemaker's impaired ability to communicate with his business colleagues, for Atlantic's reduction in income in 2002.  (Exhibit S-2; Exhibit S-3).

In short, after considering the strength of the Claimants' evidence and the Debtor's competing evidence, and employing the preponderance of the evidence standard, I find that the

---

[22]    The Debtor also presented a print out of an internet search it conducted by plugging the term "Atlantic Circulation, Inc." in the search box on google.com.  One of the resulting entries on that print out purported to be from a website titled "complaints.com."  The actual entry on complaint.com's website was not provided.  The print out of the google search reveals only the beginning words of what the website text might contain -- e.g.,: "Atlantic Circulation Inc., Mountville, Pa. - in Oct. 2003 paid $60 for 20 issues of Home Magazine - haven't received any issues."  See Exhibit D-8.  The Debtor presented this evidence in an effort to show that other business factors, unrelated to Mr. Shoemaker's reduced participation in Atlantic's business operations, were at play in the relevant time frame.  The Debtor contended that this print out evidenced customer dissatisfaction with the door-to-door magazine solicitation industry in general and with Atlantic, specifically, in the relevant time period.

I decline to give any weight to this evidence for two (2) reasons.

First, I can gather very little about the nature of the so-called "complaints" or about the October 2003 "complaint", in particular, from this document.  As Mr. Shoemaker pointed out, this google print out does not make clear what the exact nature of the "complaints" are or when the October 2003 customer (assuming the entry or "complaint" truly was made by a customer) ordered the magazine(s).  Mr. Shoemaker testified that many customers go online and/or contact Atlantic's customer service when they have not received their subscription a month after placing their order, not realizing or remembering that the first issue may take up to 120 days to arrive.  As Mr. Shoemaker also observed, the nature of the internet is such that the October 2003 "complaint" could remain on the web indefinitely, even after a customer has been satisfied by receiving the requested subscription or has received a refund.  I credit Mr. Shoemaker's observations.

Second, the Debtor did not produce any evidence to suggest that there was an upsurge in these "complaints" during the relevant time period.  Absent such evidence, even assuming arguendo that this print out constituted evidence of customer complaints, it may well be that such complaints were a "wash" -- i.e., that they existed before, during and after Mr. Shoemaker's period of impairment and, therefore, they would not provide an explanation for a reduction in Atlantic's profits.

record does not permit me to distinguish the effect, if any, that the Debtor's breach had on

Atlantic's business performance from other factors that may have caused a reduction in

Atlantic's revenue.  See National Controls Corp. v. National Semiconductor Corp., 833 F.2d 491,

496 (3d Cir. 1987) (in applying Pennsylvania law, court found that because proximate cause

requires wrongful conduct to be substantial factor in bringing about harm, entire lost profits

claim may be rejected if losses cannot be "allocated between those caused by the defendant's

breach and those not").  Therefore, I will disallow the claim for lost profits.


### C.  Pennsylvania Unfair Trade Practices and Consumer Protection Law

### 1.

The Claimants request that their actual damages be trebled damages and they be awarded

attorney's fees and costs under §201-9.2 of the CPL. Under Pennsylvania law, to recover under

the CPL, a private party must establish that:

- the defendant's services were provided "primarily for personal, family or household purposes," see 73 P.S. §201-9.2;

- the defendant's conduct was unfair or deceptive under 73 P.S. §201-3 (incorporating by reference, inter alia, id. §201-2(4));

- the plaintiff justifiably relied upon the defendant's wrongful conduct or misrepresentation, see, e.g., Hunt v. U.S. Tobacco, Co., 2008 WL 2967249, at *5-6 (3d Cir. Aug. 5, 2008) (citing Pennsylvania appellate cases); and

- the defendant's conduct caused the plaintiff  to suffer an "ascertainable loss of money or property," see 73 P.S. §201-9.2.

It is an unsettled question of Pennsylvania law whether a plaintiff seeking to establish that

certain conduct was deceptive (as opposed to fraudulent) under 73 P.S. §201-2(4)(xxi) must also

prove the elements of common law fraud (the position the Debtor urges me to adopt) or whether

21

"deception" may be established by a less restrictive standard.[23]  The intermediate appellate courts

in Pennsylvania are divided on the issue.  Compare Colaizzi, 895 A.2d at 39 (to establish

violation of catch-all provision, plaintiff must prove all elements of common law fraud);

Skurnowicz v. Lucci, 798 A.2d 788, 794 (Pa. Super. Ct. 2002)(same); Booze v. Allstate Ins. Co.,

750 A.2d 877, 880 (Pa. Super. Ct. 2000) (same); with Com. ex rel. Corbett v. Manson, 903 A.2d

69, 73-74 (Pa. Commw. Ct. 2006) (standard less restrictive than common law fraud applies).

The Pennsylvania Supreme Court has not yet ruled upon this issue.

When a federal court is confronted with a question of state law as to which the highest

court has not yet spoken, the federal court is obliged to try to predict how the highest court would

rule.  See, e.g., Hunt v. U.S. Tobacco, Co., 2008 WL 2967249, at *2.  I have carefully reviewed

the relevant case law on this issue.  Several federal courts have held that a CPL claim under the

"deception" prong of the "catch-all" provision may be established by proving that the defendant

engaged in deceptive conduct that created a likelihood of confusion or of misunderstanding

without strict proof of all of the traditional elements of common law fraud.  See Wilson v. Parisi,

549 F. Supp. 2d 637, 666 (M.D. Pa. 2008); Mertz v. Donzi Marine, Inc., 2007 WL 710263, at

*11 (W.D. Pa. Mar 06, 2007) (same); Flores v. Shapiro & Kreisman, 246 F. Supp. 2d 427, 432

(E.D. Pa. 2002) (same); In re Strong, 356 B.R. 121, 138 (Bankr. E.D. Pa. 2004), aff'd, 2005 WL

1463245 (E.D. Pa. Jun. 20, 2005); In re Patterson, 263 B.R. 82, 92-93 (Bankr. E.D. Pa. 2001)

(same).  Other federal courts have held that such a claim requires proof of common law fraud.

---

[23]      The traditional elements for proving common law fraud in Pennsylvania are: "(1)
misrepresentation of a material fact; (2) scienter; (3) intention by the declarant to induce action; (4)
justifiable reliance by the party defrauded upon the misrepresentation; and (5) damage to the party
defrauded as a proximate result."  Colaizzi v. Beck, 895 A.2d 36, 39 (Pa. Super. Ct. 2006).

See Rock v. Voshell, 397 F. Supp. 2d 616, 622 (E.D. Pa. 2005); Giangreco v. United States Life
Ins. Co., 168 F. Supp. 2d 417, 424 (E.D. Pa. 2001).

I will not engage in an extended discussion of the issue.  The arguments have been amply
discussed in the authorities cited above.  After reviewing the reported decisions, I am persuaded
by the Pennsylvania Commonwealth Court's analysis in Manson and Judge Sigmund's
thoughtful discussion in Patterson.  Accordingly, I predict that the Pennsylvania Supreme Court
would adopt the principle that a plaintiff alleging that certain conduct violated the "deception"
prong of the "catch-all" provision of the CPL must prove the existence of conduct that creates a
likelihood of confusion or misunderstanding but need not prove all of the elements of common
law fraud.

Finally, to establish a violation of the CPL, a plaintiff must do more than prove a mere
breach of contract.  This is apparent from the plain language of the statute, which speaks in terms
of requiring a showing of "unfair methods of competition" and "unfair or deceptive acts or
practices."  This principle is also reflected in Pennsylvania cases that apply and state the rule
that:

> The test used to demonstrate if there exists a cause of action in tort
> growing out of a breach of contract is whether there was an improper
> performance of a contracted obligation (misfeasance) rather than the
> mere failure to perform (nonfeasance).

Gordon v. Pennsylvania Blue Shield, 548 A.2d 600, 604 (Pa. Super. Ct. 1988) (further defining
"nonfeasance" as "omitting to do, or not doing something which ought to be done") (citation
omitted); see also Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 307 (3d Cir. 1995)
("In Pennsylvania, only malfeasance, the improper performance of a contractual obligation, raises
a cause of action under the Unfair Trade Practices and Consumer Protection Law . . . .").

23

Mis-feasance or malfeasance, which <u>does</u> give rise to a CPL violation, has been defined to require "affirmative conduct, such as an action of misrepresentation or deception, or a reckless mistake made."  <u>Suggs v. Nationwide Ins. Co.</u>, 2007 U.S. Dist. LEXIS 76641 at *10 (E.D. Pa. Oct. 16, 2007) (citation and internal quotations omitted).

It is against these legal principles that I assess the evidence concerning the Debtor's alleged violation of the CPL.


**2.**

The Claimants base their assertion that the Debtor engaged in deceptive conduct that violated the "catch-all" provision of the CPL on two representations.  First, the Claimants assert that the Loan Commitment was a false or deceptive representation that the Debtor had already secured a mortgage loan on the terms set forth therein for the Claimants "when it actually had not done so."  Claimants' Post-Trial Brief at 7.  Second, Mr. Shoemaker testified that Ms. Detweiler's reassurances that everything "was going to go smoothly and everything was taken care of . . . see you tomorrow," which were made to Mr. Shoemaker the day before the scheduled closing (<u>i.e.</u>, August 18, 2002), were also deceptive because Ms. Detweiler must have known by this point that the Debtor could not deliver on what the Claimants characterized as misrepresentations.  The Claimants stress the unfairness of the Debtors having misled them into believing they had financing in place, thereby precluding them from working with any other mortgage broker, and then knowingly permitting them to leave for Maryland with all of their belongings while operating under this misapprehension.  The consequence, according to Mr. Shoemaker, was that he and his family were thrown into a state of total "chaos," being forced to

find temporary housing, store their belongings, and attempt to salvage their acquisition of the

Property in this state of flux, all while over 150 miles away from their home.  From the

Claimants' perspective, had the Debtor conveyed to them on August 18th that the loan funds were

not available, they would not have traveled to Maryland with all of their worldly possessions and

thereby would have been spared some of the financial expense and personal inconvenience that

they experienced.

The Claimants say that the Loan Commitment and Ms. Detweiler's statement, considered

both independently and together, conveyed to them the impression that mortgage funds were

already in place to close the loan.  They infer from the Debtor's failure to appear at (or even be

reached by telephone on the day of ) the closing, its subsequent failure to contact the Claimants

after August 19th to attempt to salvage the contractual relationship by providing financing and its

failure to ever provide any explanation for its nonperformance, that the Debtor's representations

were false -- i.e. that as of the date of the Loan Commitment and as of August 18th (the date upon

which Ms. Detweiler reassured Mr. Shoemaker), the Debtor had still not secured a willing lender

for the Claimants.

At the hearing, the Debtor called no witnesses and produced no evidence to rebut Mr.

Shoemaker's testimony concerning either his relationship and communications with the Debtor

or his theory of why the Debtor never attended the August 19th closing.  Instead, the Debtor

contended, in post-trial briefing, that the Claimants' evidence on their CPL claim was

insufficient to meet their evidentiary burden.  Specifically, the Debtor contended that the

Claimants' CPL claim should be denied on the grounds that the Claimants proved nothing more

than that the Debtor had failed to perform on its promise to provide mortgage financing, and

urged that such "nonperformance or nonfeasance, without more, [does] not support an action

under the [CPL]." Debtor's Post-trial Brief at 3.[24]

**3.**

I agree with the Debtor's assumption that the Claimants bore the burden of proving their

CPL claim, even though the Debtor introduced no evidence to rebut the Claimants' CPL claim.

After reviewing the facts set forth in the Claim (including the attached Complaint) and accepting

them as true, see In re Holm, 931 F.2d at 623, I am not convinced that the allegations within the

four corners of the Claim "set forth all the necessary facts to establish a claim." Id. Specifically,

while the Complaint states the legal conclusion that the Debtor's conduct was deceptive, the

factual allegations describe only a breach of contract.

Due to these shortcomings, the Claimants' proof of claim, by itself, did not establish a

prima facie case for violation of the CPL. See Fed. R. Bankr. P. 3001(f); In re Kincaid, 388 B.R.

at 614 (where claim does not provide facts sufficient to establish legal liability, it is not entitled

to prima facie validity and burden shifts to claimant to prove claim by preponderance of the

evidence). Instead, the Claimants bore the burden to prove this claim by a preponderance of the

evidence.

At trial, the Claimants supplemented the proof of claim with testimony from Mr.

Shoemaker regarding the Debtor's alleged deceptive conduct. The issue is whether that trial

testimony was sufficient to meet the Claimants' burden of proving that the Debtor's conduct was

---

[24]     As stated above in Part IV.B.2, the Debtor treats the Loan Commitment as nothing more than the governing contract between the parties and not as a representation that financing had been secured for the Claimants in the terms described therein, while the Claimants treat the Loan Commitment as both a contract and as a misrepresentation. I need not reconcile or resolve these competing conceptualizations of the Loan Commitment because Ms. Detweiler's statement alone provides the basis for a potential CPL claim.

deceptive and created a likelihood of confusion or misunderstanding within the meaning of §201-2(4)(xxi) of the CPL.[25]

**4.**

Having carefully considered the evidence produced at trial, and applying the preponderance of the evidence standard, I find that the Debtor's conduct fell within the statutory standard for deceptive conduct. As the court stated in <u>Christopher v. First Mut. Corp.</u>, 2008 WL , "[d]eception, which is very similar to fraud, is defined as 'intentional misleading by falsehood spoken or acted.' . . . An act or practice is deceptive or unfair if it has the capacity or tendency to deceive." <u>Id.</u> at *11 (E.D. Pa. Jan. 20, 2006) (citations omitted).

The evidence established that the Debtor represented to the Claimants that it had procured mortgage financing for them. The August 2, 2002 Loan Commitment informed the Claimants that a loan had been approved on certain specific terms. Given the purpose of the relationship between the parties, this communication by the Debtor to the Claimants was sufficient to convey that the requested loan had been placed with a third party lender -- <u>i.e.</u>, that the Debtor has procured financing for the Claimants. Certainly, this impression, first conveyed by the Loan Commitment, was reinforced powerfully by Ms. Detweiler's representations to Mr. Shoemaker

---

[25]    I perceive this question to be the only disputed issue under 73 P.S. §201-9.2. The Debtor has not disputed that the Claimants purchased its services. <u>See</u> Complaint ¶30 (attached to Claim No. 5) (alleging that Debtor was to receive commission of 1% of amount financed by Claimants). Nor has the Debtor suggested that its services were not primarily for personal, family or household purposes. <u>See</u> In re Smith, 866 F.2d 576, 581 (3d Cir. 1989). The Debtor did not attempt to refute Mr. Shoemaker's credible testimony that the Claimants' relied on the Debtor's representations concerning the existence of financing when the Claimants packed up their family and belongings, left their home in Pennsylvania and traveled to Maryland. And, the Debtor has conceded that the Claimants suffered damages as a result of its conduct.

27

on August 18, 2002, the day before the scheduled closing.  Viewing the two (2) incidents together, I have no difficulty concluding that the Debtor's conduct communicated, and the Claimants had a reasonable basis to believe, that the Debtor had obtained a third party lender to provide the financing at the August 19th closing.

The somewhat closer question is whether the Debtor's representations were inaccurate when they were made and therefore, deceptive.  Had the Debtor procured a financing commitment with a third party when it made its representations to the Claimants, making the representations accurate, or were those representations inaccurate when they were made?  The Claimants did not produce any direct proof that the Debtor had not placed the loan with a third party lender by either August 2nd or August 18th.  What they did prove was that the Debtor did not produce any financing on August 19th or thereafter.

The Claimants suggest that I infer the absence of a committed third party lender (and therefore, the falsity of the Debtor's representations) from the Debtor's failure to appear at the loan closing and its failure to provide any explanation for its nonperformance, i.e., that circumstantial evidence proves the point.  The Debtor argues that the lack of direct evidence on this point defeats the claim.

In the circumstances presented in this case, I conclude that the Claimants have the better argument.  I find that the Debtor never placed the loan and therefore, that its communications to the Claimants were deceptive.  I make this finding for two (2) related reasons.

First, without some other explanation for the Debtor's nonperformance, I find the inference suggested by the Claimants to be reasonable.  In particular, the representations Ms. Detweiler made one day before the scheduled closing, implying that everything was set for a smooth closing, coupled with the Debtor's still unexplained failure to appear the next day, to

28

contact the Claimants with an explanation on the day of or at any point subsequent to the failed

closing or to attempt to re-schedule the closing with financing that the Debtor secured, is

behavior that is sufficiently out of the ordinary as to cast doubt on the bona fides of the Debtor's

conduct and representations.  The sequence of events is unusual enough to allow me, as the

factfinder, to draw the inference requested by the Claimants.  Put another way, as the factfinder

who must develop a coherent factual narrative despite gaps in the evidence, I find it more likely

than not that the Debtor had not placed the loan with a third party lender at the time it represented

to the Claimants that it had.

Second, to the extent that there might be a more benign explanation for the Debtor's

failure to perform, the evidence relating to that explanation (be it testimonial or documentary)

most likely was within the control of the Debtor and the Debtor has not suggested otherwise.

Yet, the Debtor produced no evidence explaining why it failed to appear at the closing on August

19th.  In these circumstances, I will draw an adverse inference that had the Debtor come forward

with the relevant evidence, it would have been unfavorable to its case.[26]  E.g., In re Butts, 350

B.R. 12, 19 n.8  (Bankr. E.D. Pa. 2006), aff'd, 2007 WL 1722805 (E.D. Pa. Jun 13, 2007);

accord Reno v. Kolcraft Enters., 2002 U.S. Dist. LEXIS 28186 (S.D. Fla. Apr. 16, 2002) ("when

a party has relevant evidence within his control which he fails to produce, that failure gives rise

to an inference that the evidence is unfavorable to him.") (quoting Callahan v. Schultz, 783 F.2d

1543, 1545 (11th Cir. 1986)).

---

[26]      It is almost certain that Ms. Detweiler is no longer employed by the Debtor  (since the
Debtor is no longer operating its business) and therefore, she may no longer be a witness under the
Debtor's "control." However, I also presume that the Debtor maintained records of its activities when it
acted as the Debtor's loan broker.  The Debtor made no representation that the documentary evidence
(i.e., its loan file) was lost or otherwise unavailable.  If the Debtor actually procured financing for the
Claimants, undoubtedly there would be some documentary evidence of that fact in the loan file.

Next, to the extent that a scienter requirement exists under §201-2(4)(xxi) of the CPL,[27] in the circumstances presented here, I find that the Debtor knew that its representations were inaccurate.  This actual knowledge satisfies that requirement.

Finally, I address briefly the Debtor's argument that the record establishes nothing more than a breach of contract.  Were the Claimants' case dependent solely on the Debtor's failure to perform in accordance with the terms of the Loan Commitment, I might agree.  However, on August 18th, when the Debtor reiterated its ability and intention to perform its obligations, at a time when it appears it must have known that it could not provide the financing at the scheduled closing, its conduct deceived the Claimants into believing that financing was in place, thereby depriving them of the opportunity to avoid or mitigate much of the harm that they have suffered. I find this conduct sufficient to transform the case from a simple breach of contract into a case involving unfair and deceptive conduct under §201-2(4)(xxi) of the CPL.

For these reasons, I conclude that the Claimants are entitled to relief under the CPL.


**5.**

Next, I address the amount of damages to be allowed under the CPL.

Section 201-9.2 of the CPL provides that the court may award treble damages "in its discretion."  It follows that the award of treble damages is not mandated in every successful private action.  E.g., McClelland v. Hyundai Motor Am., 851 F.Supp. 680, 681 (E.D. Pa. 1994). But see Skurnowicz, 798 A.2d at 797.

---

[27]    In Wilson v. Parisi,, the court suggested that a deceptive act under §201-2(4)(xxi) of the CPL requires that there be " a false representation made knowingly or recklessly with the intent that another person . . . detrimentally rely on it."  549 F.Supp.2d at 666.  To decide this case, I need not define the boundaries of any scienter requirement that may exist under §201-2(4)(xxi) of the CPL.

A number of courts have held that the award of treble damages under §201-9.2 is punitive in nature, mandating evaluation of the factors considered by courts in awarding punitive damages.  E.g., Johnson v. Hyundai Motor Am., 698 A.2d 631, 639-40 (Pa. Super. Ct. 1997); In re Patterson, 263 B.R. at 98.

Last year, however, the Pennsylvania Supreme Court held that the award of treble damages under §201-9.2:

> should not be closely constrained by the common-law requirements associated with the award of punitive damages. . . . Centrally, courts of original jurisdiction should focus on the presence of intentional or reckless, wrongful conduct, as to which an award of treble damages would be consistent with, and in furtherance of, the remedial purposes of the UTPCPL.

Schwartz v. Rocky, 932 A.2d 885, 898 (Pa. 2007).

In this case, I will  exercise my discretion to allow treble damages.  The Debtor offered no evidence to suggest that its conduct was not deceptive to rebut its liability under the CPL.  Nor did the Debtor present any evidence to suggest that it would be inequitable to award treble damages.  See, e.g., In re Bryant, 111 B.R. 474, 480 (Bankr. E.D. Pa. 1989) (after finding a CPL violation, treble damages awarded in absence of any "equities in the defendant's favor to make such trebling of damages inappropriate").  Although the record made may not have been ideal, it was adequate to convince me that the Debtor's conduct was sufficiently reckless and wrongful to justify an award of treble damages under the CPL.

The actual damages were $11,207.50.  Therefore, I will allow a CPL claim in the amount of $33,622.50.

**6.**

Finally, I will address the Claimants' request that attorney's fees and costs be included in the allowed claim.  The Claimants request that $9,076.93 be allowed in attorney's fees and costs.[28]

Section 201-9.2 of the CPL states that the court "may award to the plaintiff, in addition to other relief provided in this section, costs and reasonable attorney's fees."  The award of counsel fees is within the trial court's discretion.  E.g., Sewak v. Lockhart, 699 A.2d 755, 762 (Pa. Super. Ct. 1997); In re Armstrong, 288 B.R. 404, 428 (Bankr. E.D. Pa. 2003).

The Claim was filed in the amount of $179,290.50.  The methodology used for the calculation of that amount is apparent from the documents attached to Claim.  Exhibit "B" to the Claim is a copy of the state court complaint filed against the Debtor and Ms. Detweiler.  The amount requested in the Claim is the same as that set forth in the request for relief under count V of the complaint, in which the Claimants asserted a claim under the CPL.  In that request for relief, the Claimants also requested attorney's fees and costs.  Based on the Claim as filed, I conclude that the Debtor had adequate notice that the Claimants' CPL claim included a request for attorney's fees and costs to be added to the treble damages requested.[29]

---

[28]      I note that all of the attorney's fees requested are for services rendered prepetition. Therefore, I am not asked to determine if an unsecured creditor is entitled to the allowance of counsel fees incurred postpetition.  See generally In re SNTL Corp., 380 B.R. 204, 217-23 (B.A.P. 9th Cir. 2007) (collecting cases and then holding that such fees may be allowed as part of an unsecured claim based upon a contractual fee-shifting provision).

[29]      Additionally, because, at the conclusion of the hearing, the total claim that the Claimants requested be allowed was less than the amount set forth in the Claim as filed, I see no prejudice to the Debtor in considering the request for allowance of attorney's fees and costs under the CPL.  Although the Debtor objected to allowance of attorney's fees and costs, it did not claim surprise or request additional time to marshal evidence to rebut the evidence submitted by the Claimants on the issue of allowing attorney's fees and costs.

The Claimants produced evidence that between April 29, 2004 and November 10, 2005, they incurred $9,076.93 in attorney's fees and costs, in the form of attorney time records and cost itemization.  See Exhibit S-9.  I have reviewed the Exhibit S-9 and I am satisfied that the fees and costs requested are reasonable.  In the exercise of my discretion under §201-9.2 of the CPL, I will allow the requested fees and costs in their entirety.


## V.  CONCLUSION

For the reasons set forth above, I will sustain the Debtor's Objection to the Claimants' Claim and overrule it in part.  The claim will be allowed in part and disallowed in part.  The claim will be allowed as follows:

| | |
|---|---|
| actual damages | $11, 207.50 |
| | x        3 |
| | $33,622.50 |
| | + |
| attorney's fees/costs | $  9,076.93 |
| **TOTAL** | **$ 42,699.43** |

An Order consistent with this Memorandum will be entered.

Date:  **September 15, 2008**

**ERIC L. FRANK**
**U.S. BANKRUPTCY JUDGE**